UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DENNIS COPELAND,<br><br>           Plaintiff,<br>      v.<br><br>MICHAEL J. ASTRUE, COMMISSIONER OF<br>SOCIAL SECURITY,<br><br>           Defendant. | Case No.: 12-cv-3137-PSG<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>**(Re: Docket Nos. 20, 23)** |

Plaintiff Dennis Copeland ("Copeland") filed this action on June 18, 2012, appealing the decision by Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying disability insurance benefits.[1]  Copeland moves for summary judgment. The Commissioner opposes the motion and cross-moves for summary judgment.  The matter was submitted without oral argument pursuant to Civ. L.R. 16-5.  Having reviewed the papers and considered the

---

[1] The challenged decision was rendered by Administrative Law Judge Teresa Hoskins Hart (the "ALJ") on August 26, 2011. The ALJ's decision became final on April 20, 2012, when the Appeals Council of the Social Security Administration denied Copeland's request for administrative review of the decision.

1

Case No.: 12-3137 PSG
ORDER

arguments of counsel, the court DENIES Copeland's motion for summary judgment and GRANTS the Commissioner's cross-motion for summary judgment.

## I.   BACKGROUND

Copeland was born November 14, 1973 and was 37 years old when the ALJ issued her decision.[2] Copeland did not graduate from high school, but earned his GED, completed a union apprentice program, and attended some college.[3] Copeland was a carpenter for roughly 16 years, until December 12, 2007, when he claims back pain prevented him from working.[4] In February, 2008, Copeland was in a skateboarding accident that he claims exacerbated his pain and triggered his disability.[5] He has been unemployed since.[6]

### A.   Medical Evidence

Copeland apparently injured himself skateboarding in February 2008 and sought emergency room medical care for low back pain and reduced range of motion. Copeland received an MRI in March 2008 that showed degenerative changes to the L4-5 disc, and possibly a subtle L5 misalignment.[7] In both March and May of 2008 he was also admitted to the emergency room with moderate lumbar back pain.[8] Both times the pain was reduced with medication and he was

---

[2] *See* AR at 25, 34.

[3] *See id.* at 89, 349-50.

[4] *See id.* at 342-46.

[5] *See id.* at 20

[6] *See id.* at 85, 345-48. Copeland claims that he could no longer work beginning December 12, 2007, but that the pain did not become disabling until March 1, 2008. There is note of a possible construction job held for two months in 2008, but it is unmentioned in ALJ's report. *See id.* at 175.

[7] *See id.* at 212.

[8] *See id.* at 188-99.

2

Case No.: 12-3137 PSG
ORDER

released the same day.[9] Copeland then began consultations with a series of doctors from 2008-2011.

In May and June 2008, Copeland consulted separately with Dr. Iran Meraz ("Meraz") and Physicians' Assistant Lori Kraus ("Kraus"), complaining of pain in his back.[10] Meraz noted that Copeland exhibited full motor strength, normal gait, and a negative Straight Leg Raise ("SLR") test results, while Kraus noted that, despite claiming it was difficult for him to stand or bend over, Copeland engaged in multiple outdoor activities including mountain biking and hiking.[11]

In July 2008, Copeland received a second MRI from Dr. Lawrence Vierra ("Vierra") indicating his thoracic spine showed multiple disc bulges and protrusions with contouring of the ventral margin of the spinal cord, but no spinal stenosis or neural foraminal encrocahment.[12] Vierra diagnosed him with classic degenerative disc disease of L4-5 and early spondylosis. Vierra found that Copeland was "well built," suffered no acute distress, could carefully squat, and had full motor strength, normal gait, normal heel-toe walk, and negative SLRs.[13] Two weeks later, Copeland met with Dr. Robert Rocco ("Rocco"), who found that Copeland's could not sit or stand for more than ten minutes, and that Copeland could not bend, lift, or squat. Rocco then filled out a disability form for Copeland.[14]

---

[9] *See id.* at 192, 199.

[10] *See id.* at 182-87.

[11] *See id.* at 182.

[12] *See id.* at 209-10.

[13] *See id.* at 181.

[14] *See id.* at 169. The form itself is not in the record.

3

Case No.: 12-3137 PSG
ORDER

Copeland first applied for disability benefits in August 2008.[15] That same month, J. Risinger ("Risinger"), a state agency consultant, reviewed Copeland's record and provided case analysis.[16] Risinger reported inconsistencies within Copeland's medical record and found his symptoms only partially credible as a result.[17] Risinger determined that Copeland could sustain light work because Copeland had no stenosis and seemed to improve after medication.[18] The state agency's medical consultant, Dr. Nalini Tella ("Tella"), concurred. Tella opined that Copeland could sustain light work with occasional climbing, balancing, stooping, and crouching,[19] that he could stand and walk for six hours and sit for six hours during an eight hour work day, and that he had unlimited pushing and pulling abilities.[20] She also stated that Copeland could lift and carry 10 pound frequently and 20 pounds occasionally.[21] Tella also noted that Copeland had normal sensation, normal motor strength, normal gait, a normal heel-toe walk, and could squat. She also believed that Copeland's various outdoor activities "severely eroded" his credibility.[22] Copeland's disability request was denied.[23]

In December 2008, Copeland met with Dr. Kevin Herrick ("Herrick"), who treated him for bloody stools and told him to decrease his alcohol consumption.[24]

---

[15] *See id.* at 51, 141.

[16] *See id.* at 141-42.

[17] *See id.* at 142.

[18] *See id.*

[19] *See id.* at 145.

[20] *See id.* at 144.

[21] *See id*

[22] *See id.* at 150.

[23] *See id.* at 16.

[24] *See id.* at 176.

4
Case No.: 12-3137 PSG
ORDER

In January 2009, Copeland, complaining about back pain, met with Dr. Wendell Dinwiddie ("Dinwiddie"). Dinwiddie noted a tender lower back and no lordotic curve, but a negative SL,[25] and referred Copeland to a back specialist, Dr. Eric Carlblom ("Carlblom"), for possible surgery or pain management. Carlblom diagnosed Copeland with right SI dysfunction, strain symptoms of the lumbar region and mild L4-5 degenerative disc disease, but could not identify the source of the symptoms.[26] Carlblom ordered an x-ray, revealing advanced degenerative disc disease and spondylosis, mild L5-S1 degenerative disc disease, and minimal extension at L4-5.[27] Carlblom then referred Copeland to Dr. Victor Li ("Li") for further pain medicine consultation.[28]

In March 2009, Copeland met with Li to deal with his low back pain.[29] Li reported that Copeland's MRI showed mild degenerative disc disease without significant spinal stenosis, and that X-rays showed loss of the L4-5 disc height with degenerative changes and mild L5-S1 degeneration with some facet arthopathy.[30] Li also reported that Copeland's gait was antalgic, but that he was well-developed, well-nourished, in no apparent distress, and had full muscle strength and negative SLRs.[31] Li administered two nerve injections to reduce the pain and ordered an MRI.[32]

---

[25] *See id.* at 173-174.

[26] *See id.* at 172.

[27] *See id.* at 179.

[28] *See id.* at 163.

[29] *See id.* at 163-66, 171.

[30] *See id.* at 164.

[31] *See id.* at 163, 165, 166.

[32] *See id.* at 166.

Case No.: 12-3137 PSG
ORDER

The April 2009 MRI showed normal vertebral alignment with preservation of the vertebral body heights and moderate focal loss of disc height at L4-5 and mild loss of height at L5-S1.[33] There was disc protrusion at L5-S1 with an associated disc tear and minimal displacement of the nerve root. There was also protrusion at L3-4 with a probable tear but no stenosis. There was moderate spondylosis at L4-5 with disc bulge and hypertrophic facet changes causing impingement. Li also noted degenerative disc disease with questionable tears at L5-S1 and L3-4, as well as multilevel facet arthopathy.[34] Li diagnosed Copeland with lumbar spondylosis, lumbar degenerative disc disease, and lumbar radiculopathy.

In June 2009, Copeland again filed for disability.[35] His file was reviewed in August 2009 by B. Calip ("Calip"), another state agency consultant.[36] A second opinion noted that the MRI did not show nerve compression and that Copeland's motor strength was normal. Tella's earlier assessment was affirmed, and Copeland's application was again denied.[37]

In October 2010, Copeland filed a request for a hearing regarding his disability.[38] Around this time, upon referral by Herrick, Copeland also began to meet with Dr. Willard Wong ("Wong"). Despite Copeland's complaints, Wong found that Copeland could still perform a heel-toe walk, had normal motor strength, and had a negative SLR.[39] Wong was unable to locate the source of Copeland's pain, and the two discussed the possibility of surgery.[40] In January 2011, Wong also

---

[33] *See id.* at 151-52, 157-58.

[34] *See id.* at 155-56.

[35] *See id.* at 167.

[36] *See id.* at 213-15.

[37] *See id.*

[38] *See id.* at 20.

[39] *See id.* at 235.

ordered an MRI, which showed a mild annular disc bulge, an annular fissure, and moderate right neuroforaminal narrowing of the L5-S1 disc, but no stenosis. There were also type one endplate changes indicating instability of the L4-5 disc with a mild annular disc bulge and moderate and mild neuroforaminal narrowing. The L3-4 disc also exhibited a bulge and a posterior central annular fissure, but no stenosis or neuroforaminal narrowing.[41]

In February 2011, Copeland began complaining of great difficulty walking.[42] Wong diagnosed Copeland with predominantly mechanical lower back pain, possibly discogenic in origin, and possible lumbar radiculopathy due to L4-5 stenosis.[43] In March 2011, Copeland opted for surgery to reduce the pain. He underwent elective L4-5 forminotomy, T-lift with peak inner body cage, infused BMP and mass to graft, and L3-S1 posterolateral in situ fusion with pedical instrumentation.[44] There were no complications.[45]

Two weeks later Copeland again complained of lower back stiffness when immobile, but he had no lower extremity symptoms and could walk with a front-wheeled walker.[46] Wong recommended physical therapy and medication management.[47] In April 2011, Copeland claimed he had hyperextended his back and felt a mild tearing sensation.[48] Wong noted Copeland appeared well, was in no acute distress, was weight-bearing, could get up and off the exam table, and walked

---

[40] *See id.* at 236.

[41] *See id.* at 227-28.

[42] *See id.* at 233.

[43] *See id.*

[44] *See id.* at 216-23, 225-26, 245-320.

[45] *See id.* at 245-48.

[46] *See id.* at 231, 241.

[47] *See id*. at 231.

[48] *See id.* at 229.

7
Case No.: 12-3137 PSG
ORDER

easily.[49] In May 2011, Copeland complained to Wong of further pain, but was able to perform personal care and ambulate without difficulty.[50] So Wong recommended an independent home exercise program.[51]

In June, 2011, Herrick submitted a functional capacity questionnaire.[52] Herrick wrote that Copeland's pain prevented him from concentrating or performing simple work tasks,[53] and that Copeland could sit or stand for only 5 minutes at a time for four hours during an eight hour work day.[54] He also stated that Copeland required a job that allowed him to shift positions at will,[55] that he required unscheduled walking breaks, and that he had a limited range of physical abilities.[56] Herrick believed that Copeland could only carry and lift less than ten pounds frequently, ten pounds occasionally, and twenty pounds rarely. Copeland could never climb, and could twist, stoop, bend, crouch, squat, and climb stairs rarely.[57] Copeland could engage in frequent neck movements.[58] Herrick finally noted that Copeland would miss roughly four days of work per month.[59] Herrick diagnosed Copeland with degenerative disc disease, but noted that there was

---

[49] *See id.*

[50] *See id.* at 336-37.

[51] *See id.* at 337.

[52] *See id.* at 321.

[53] *See id.* at 322.

[54] *See id.* at 322-23.

[55] *See id.* at 323.

[56] *See id.* at 324.

[57] *See id.*

[58] *See id.*

[59] *See id.*

"[n]o objective support of [Copeland's] pain" besides surgical scars.[60] Although Herrick attested on the RFC questionnaire that he had been treating Copeland monthly for two years, there is no documentation to this effect.[61]

A November 2011 x-ray of Copeland showed that post-surgery his interbody cage was well positioned.[62] There was some bone in the anterior body space suggesting anterbody fusion, and what appeared to be posterior lateral fusion at L4-5 and minimal fusion mass in the region of the inter-transverse process areas.[63] Wong opined that Copeland's residual mechanical lower back pain was myofascial (muscular).[64]

**B.   Hearing**

The ALJ held a hearing on July 19, 2011.[65] At the hearing, Copeland testified that he had received unemployment benefits from the State of Oregon, but that he did not need to certify his ability to work to receive those benefits.[66]

**C.   ALJ's Findings**

At step one, the ALJ found the Copeland had not performed substantial gainful activity since December 2007.[67] At step two, the ALJ found that Copeland had medically determinable impairments of degenerative disc disease, spondylosis, and status post L4-5 foraminotomy. The

---

[60] *See id.* at 321.

[61] *See id.* The only documentation indicating that Herrick ever saw Copeland in person is a Clinical Flowsheet. *See id.* at 176. But Herrick did refer Copeland to other doctors. *See id.* at 234.

[62] *See* AR at 337.

[63] *See id.* at 336.

[64] *See id.* at 337.

[65] *See id.* at 340.

[66] *See id.* at 20, 346-348.

[67] *See id.* at 18, 345-346. Copeland has not been employed since December 2007. He claims that he did not become unemployable until March 2008.

9
Case No.: 12-3137 PSG
ORDER

ALJ also noted a prior history of pancreatitis and gastritis, but found that the medical evidence did not establish that these impairments would cause more than minimal limitations on Copeland's ability to work.[68] At step three, the ALJ found that none of Copeland's impairments met or equaled any of the listed requirements. At step four, the ALJ found that Copeland could not perform his past relevant work as a carpenter.[69] The ALJ then found that Copeland had residual function capacity (RFC) to perform light work limited to no more than occasional climbing, balancing, stooping, or crouching.[70] At step five, the ALJ relied on the vocational expert's finding that Copeland could work at one of a substantial number of jobs in the regional area.[71]

The ALJ gave several grounds for her determination. Although she found that Copeland's alleged symptoms could be caused by his impairments, she found that Copeland's statements concerning "the intensity, persistence, and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent" with his RFC determination.[72] She based this on Copeland's functional abilities including normal gait,[73] normal motor strength,[74] and negative SLRs.[75] The ALJ also based this on observations of Copeland ambulating with ease,[76] and performing heel-toe

---

[68] *See id.*

[69] *See id.* at 23.

[70] *See id.* at 23-24.

[71] *See id.* at 24.

[72] *See id.* at 21-22.

[73] *See id.* at 142, 181, 185, 236-237, 243.

[74] *See id.* at 19, 181, 186-87, 232-33, 236-37, 243.

[75] *See id.* at 19, 174, 176-87, 182, 185-87, 232-33, 236-37, 243.

[76] *See id.* at 185, 236-39, 243.

walks.[77] The ALJ also referenced Copeland's statements to Krauss that he enjoyed outdoor physical activity, including hiking and mountain biking.[78]

The ALJ also evaluated Herrick's June 2011 assessment of Copeland's physical abilities, but gave the report reduced probative weight because it was inconsistent with other objective medical findings, especially the physical tests indicated above.[79] Moreover, the ALJ gave substantial probative weight to Tella's findings that Copeland could perform a variety of everyday work tasks because her findings were "consistent with the record."[80] Finally, the ALJ discounted the probative weight to the state agency medical consultant's reported limitations, insofar as they conflicted with Dr. Tella's opinion and were inconsistent with the objective medical evidence.[81]

Copeland now requests that the court reverse the final decision of the Commissioner and order the payment of disability insurance benefits. In the alternative, Copeland requests remand of his case for further administrative proceedings. The Commissioner asks that the ALJ's final decision be affirmed.

## II. LEGAL STANDARDS

### A. Standard for Reviewing the Commissioner's Decision

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review the Commissioner's decision denying Copeland benefits. The Commissioner's decision (here the underlying decision of the ALJ) will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.[82] In this context, the term "substantial evidence"

---

[77] *See id.* at 142, 181, 214, 236-37, 243.

[78] *See id.* at 22.

[79] *See id.* at 22-23.

[80] *See id.* at 23.

[81] *See id.*

11
Case No.: 12-3137 PSG
ORDER

means "more than a scintilla but less than a preponderance – it is such relevant evidence a reasonable mind might accept as adequate to support the conclusion."[83] When determining whether substantial evidence exists to support the administrative record as a whole, the court must consider adverse as well as supporting evidence.[84] Where evidence exists to support more than one rational interpretation, the court must defer to the decision of the ALJ.[85]

**B.     Standard for Determining Disability**

Disability claims are evaluated using a five-step, sequential evaluation process. In the first step, the Commissioner must determine whether the claimant currently is engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied.[86] If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments that significantly limits the claimant's ability to do basic work activities; if not, a finding of "not disabled" is made and the claim is denied.[87] If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing; if so, disability is conclusively presumed and benefits are awarded.[88] If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step

---

[82] *See Moncada v. Chater,* 6- F.3d 521, 523 (9th Cir. 1995); *Drouin v. Sullivan,* 966 F.2d 1255, 1257 (9th Cir. 1992).

[83] *See Moncada,* 60 F.3d at 523; *Drouin,* 966 F.2d at 1257.

[84] *See Drouin,* 966 F.2d at 1257; *Hammock v. Bowen,* 879 F.2d 498, 501(9th Cir. 1989).

[85] *Moncada,* 60 F.3d at 523; *Drouin,* 966 F.2d at 1258.

[86] *See* 20 C.F.R. § 416.920.

[87] *See id.*

[88] *See id.*

requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity"[89] to perform his or her past work; if so, the claimant is not disabled and the claim is denied.[90] The plaintiff has the burden of proving that he or she is unable to perform past relevant work.[91] If the claimant meets this burden, a prima facie case of disability is established. The Commissioner then bears the burden of establishing that the claimant can perform other substantial gainful work;[92] the determination of this issue comprises the fifth and final step in the sequential analysis.

### III. DISCUSSION

Copeland challenges only the ALJ's evaluation of the medical evidence, and in particular the relative weight that she gave reports by Herrick and Rocco in comparison to the weight she gave Tella's report in making the RFC determination. According to Copeland, Herrick was his treating physician whose opinion was entitled to greater deference from the ALJ. Copeland asserts that the ALJ rejected Herrick's opinion without providing specific and legitimate reasons supported by substantial evidence. Copeland also contends that the ALJ should have given Rocco's opinion greater weight because he was an examining physician, and that the ALJ again erred by failing to provide specific and legitimate reasons supported by substantial evidence for the reduced weight she gave his reports. Copeland does not challenge any of the ALJ's credibility findings or any other element of the five-step determination.

---

[89] A claimant's residual functional capacity ("RFC") is what he or she can still do despite existing exertional and nonexertional limitations. *See Cooper v. Sullivan,* 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

[90] *See Drouin,* 966 F.2d at 1257; *Gallant v. Heckler,* 753 F.2d 1450, 1452 (9th Cir. 1984).

[91] *See id.*

[92] There are two ways for the Commissioner to meet the burden of showing that there is work in significant numbers in the national economy that claimant can do: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines. *See Tackett v. Apfel,* 180 F.3d 1094, 1099 (9th Cir. 1999).

13

Case No.: 12-3137 PSG
ORDER

The Ninth Circuit distinguishes among three types of physicians who may provide medical evidence for disability benefits claims: (1) "those who treat the claimant (treating physicians)"; (2) "those who examine but do not treat the claimant (examining physicians)"; and (3) "those who neither examine nor treat the claimant (nonexamining physicians)."[93] "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."[94] And so, "[a]t least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for 'clear and convincing' reasons."[95] Where the treating physician's opinion is contradicted by another doctor, the ALJ "may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record."[96]

After treating physicians, examining physicians are accorded the next highest weight: the ALJ also must provide "clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician" and "specific and legitimate reasons that are supported by substantial evidence" for rejecting contradicted opinions.[97] "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician."[98]

As a preliminary matter, because Copeland does not challenge the ALJ's credibility findings, the court accepts those findings and notes that from its review of the record, the ALJ properly determined Copeland was not entirely credible. The ALJ noted that because of several inconsistencies between his testimony at the hearing and his reports to physicians, Copeland's

---

[93] *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.*

[98] *Id.*

14
Case No.: 12-3137 PSG
ORDER

"allegations [were] not fully credible."[99] Because of those inconsistencies, the ALJ determined that his claims regarding his pain were not credible to the extent the objective medical evidence did not support those claims.[100] The court finds no error in this determination. Based on the ALJ's observations and the various medical care providers' observations, Copeland's allegations of pain were inconsistent with the objective medical evidence. Copeland's potentially inconsistent statements to the SSA, which requires that a claimant cannot perform work,[101] and to the Oregon State unemployment agency from which he was receiving unemployment benefits, which requires applicants to certify that they are looking for work,[102] further supports the ALJ's findings.

The court also notes that it is not clear from the record before the ALJ or before this court that Herrick in fact served as a treating physician. Despite Herrick's statements that Herrick saw Copeland monthly for two years,[103] only one appointment between Copeland and Herrick appears in the record, and at that appointment, Copeland complained of bloody stools, not back pain.[104] This limited treatment history suggests Herrick is not a treating physician, at least not with regard to the impairment Copeland claims rendered him disabled – his back problems.[105]

But even assuming Herrick was Copeland's treating physician, the ALJ provided specific and legitimate reasons to weigh less heavily Herrick's opinion. As the ALJ observed, Herrick's

---

[99] AR at 22.

[100] *See id.*

[101] *See* 20 C.F.R. § 416.920(a)(4)(i).

[102] *See* 50 O.R.S. § 657.155(1)(c).

[103] *See* AR at 321.

[104] *See id.* at 176.

[105] *See* 20 C.F.R. §§ 404.1502, 416.902 (noting that an "ongoing treatment relationship" finding turns on whether the "medical evidence establishes that [a claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition(s).").

15
Case No.: 12-3137 PSG
ORDER

opinion was contradicted not only by Tella but by other physicians that Copeland saw for treatment of his back pain, notably Wong who was Copeland's orthopedic surgeon and who observed that Copeland could walk easily, could get up from the exam table, and could care for himself.[106] The ALJ also pointed to Copeland's own statement to Kraus that he mountain-biked, hiked, and was active despite his complaints of back pain.[107] These opinions contradict Herrick's opinion that Copeland was severely limited in his ability to sit, to stand, or to concentrate. Combined with the limited evidence regarding Herrick's experience with Copeland regarding his back pain, the ALJ found Herrick's opinion should be afforded less weight.[108] And as just described, that decision is supported by substantial evidence in the record.

The ALJ's determination as to Rocco likewise arose from specific and legitimate reasons supported by substantial evidence. Again, Rocco's opinion regarding Copeland's ability was contradicted not only by the medical evidence from Wong and Copeland's admissions to Kraus, but also by an examination of Copeland by Vierra three weeks before Rocco's examination during which Vierra noted Copeland had a normal gait, could perform a squat, could heel-toe walk, and had full motor strength.[109] Meraz's observations of Copeland, including a description of his full motor strength, negative SLR, normal gait, and good muscle tone, only a couple of months earlier also contradict Rocco's determination that Copeland had limited abilities.[110] Given the proximity in the two contradictory diagnoses and other medical evidence suggesting the earlier diagnoses

---

[106] *See* AR at 336-37.

[107] *See id.* at 21, 182.

[108] *See id.* at 21.

[109] *See id.* at 181.

[110] *See id.* at 185-88.

16
Case No.: 12-3137 PSG
ORDER

were more accurate, the ALJ had substantial evidence to support her determination that Rocco's opinion should be given less weight.

As for Tella, the ALJ found that at least parts of her opinion aligned with the other medical evidence Copeland presented. Like Wong and consistent with Copeland's admissions, Tella concluded that Copeland could perform light work.[111] As the ALJ noted, Tella's determination was consistent with findings from Meraz, Wong, Kraus, and Vierra. Substantial evidence thus supports the ALJ's decision to afford Tella's opinion greater weight than Herrick's or Rocco's.

Because the ALJ offered specific and legitimate reasons for the relative weight she gave to Herrick's, Rocco's, and Tella's opinions and because those reasons are supported by substantial evidence, the ALJ's decision was proper. The court DENIES Copeland's motion for summary judgment and GRANTS the Commissioner's cross-motion for summary judgment.

**IT IS SO ORDERED.**

Dated:  June 26, 2013

_____
PAUL S. GREWAL
United States Magistrate Judge

---

[111] *See id.* at 143-50.

Case No.: 12-3137 PSG
ORDER